UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF MASSACHUSETTS

KINGVISION PAY-PER-VIEW, LTD. )
       Plaintiff,     )
                        )   Civil Action No. 05-10262-RGS
v.                    )                     LTS
                        )
PAUL HAMMOND, et al.,    )
       Defendants.   )

## DEFENDANT'S OPPOSITION TO
## MOTION TO STRIKE JURY TRIAL DEMAND

### I.    Introduction

The case law is divided on whether the parties have a right to a jury trial on actions under

47 U.S.C. §§553 and 605. There has, however, been a recent trend to allow jury trials in these

types of cases. In determining whether statutory damages are more legal or equitable in nature,

the courts look to what function the monetary damages serve. As is shown below, cases in this

District use statutory damages to approximate actual damages and sometimes for punitive

purposes. These purposes are clearly legal and not equitable remedies.

### II.    Argument

The plaintiff contends that the defendant is not entitled to a jury trial because the relief

sought is statutory damages rather than compensatory or punitive damages. In support of this

contention, plaintiff relies on Joe Hand Promotions, Inc. v. Nekos, 18 F. Supp. 2d 214 (N.D.

N.Y. 1998). However, in Time Warner Cable of New York City v. Negovan, 2001 U.S. Dist.

LEXIS 15900 (2001), (attached hereto as Exhibit "A") the court criticizes the Joe Hand

Promotions decision and gives a well-reasoned rationale for a jury trial under 47 U.S.C. §§553

and 605.

In <u>Time Warner Cable of New York City</u>, the court stated:

> "The critical fact is that the statute provides a legal remedy -- i.e.,
> damages -- for encroachment on a person's property rights. In
> <u>Feltner</u>, for example, the Court found a right to a jury trial because
> "actions seeking damages for infringement of common-law
> copyright, like actions seeking damages for invasions of other
> property rights, were tried in courts of law in actions on the case."
> 523 U.S. at 349.
>
> In any event, the more important inquiry under the Seventh
> Amendment is the nature of the relief sought. Tull, 481 U.S. at
> 421.

In a similar case to ours, <u>National Satellite Sports, Inc., v. Cotter's Lounge</u>, 88 F. Supp.

2d 1024 (2000), (attached hereto as Exhibit "B") the court held that the defendant had a right to a

jury trial under the Seventh Amendment. The court decided:

> "Although actual damages in cable piracy cases are consistent with
> the nature of restitutionary damages, the legislative history reveals
> an expressed intent of Congress to allow the statutory damages in
> addition to the actual damages. This fact supports the notion that
> statutory damages are to punish and not to simply compensate the
> wronged party. This interest in punishment is only consistent with
> a legal remedy, and not an equitable one, therefore this Court holds
> that a Tull type [*1027] analysis yields actions under §§ 553 and
> 605 to be legal, preserving the right to a jury trial under the
> Seventh Amendment"

In a recent District of Massachusetts case, <u>Charter Communications Entertainment I,</u>

<u>LLC v. Cintron</u>, et al. 2005 U.S. Dist. LEXIS 11678, (attached hereto as Exhibit "C") this Court

discussed the methodology for determining damages in cases under §§553 and 605. The Court

discussed how in this District, the Court has traditionally "used statutory damages to

approximate actual damages." The Court reasoned:

> "In <u>Comcast of Massachusetts I, Inc. v. Naranjo</u>, Judge Keeton of
> this District addressed the problem of how to calculate statutory
> damages under §§ 553 in a case involving cable piracy for private

home use. 303 F. Supp 2d 43 (D. Mass. 2004). The cable provider had encourages the court to consider a number of factors in calculating statutory damages, including "the willfulness of defendant's violation, the importance of 'general and specific' deterrence, defendant's cooperation with plaintiff, and the actual damages in determining the appropriate award of statutory damages." *Id. at 47.* The court, however, rejected Comcast's factor-based analysis, concluding that statutory damages should be "as reasonable an estimate of actual damages as the facts. . . allow," not greater. *Id.*

The Court observed that the plain language of §553 provides that actual damages and statutory damages are "coordinate alternatives," with no difference or preference [*23] between them.

Moreover, the Court in this District and others have consistently used statutory damages to not only approximate actual damages, as in Naranjo, but also added punitive amounts to deter future violations. See, e.g., Cablevision Systems New York City Corp. v. Rosa, 2002 U.S. Dist LEXIS 6140, 2002 WL 1446942, at *5 (opining that damages should be calculated to deter future misconduct and to avoid granting defendants a windfall); Joe Hand Promos., Inc. v. Salinetti, 148 F. Supp. 2d 119, 120-23 (D. Mass 2001) (multiplying approximate actual damages by five to reach statutory damages, reasoning that the defendants should pay more than just restitution costs); Mountain Cable Co. v. Choquette, 53 F. Supp. 2d 107, 112 (D. Mass. 1999) (awarding $3,000 in statutory damages where a landlord distributed illegally intercepted cable to two apartment units and his own residence, noting that the sum reflected the "seriousness of defendant's violation balanced against the relatively small scale of his illegal activity").

Thus, at least in this District, it is clear that the court emphasizes the need to compensate the plaintiff for its actual loss and deter the defendant and others from future violations. Since "statutory damages under Section 553 and 605 serve both punitive as well as restitutionary purposes, they are considered legal remedies." Time Warner Cable of New York City p. 5

## III.    Conclusion

For all of the above reasons, defendant respectfully requests that the plaintiff's motion to strike defendant's jury demand be denied.

Respectfully submitted,

DiMENTO & SULLIVAN

August 9, 2005

Francis J. DiMento, Jr.
BBO No. 547337
Seven Faneuil Marketplace
Third Floor
Boston, MA  02109
(617) 523-2345

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE
DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD
FOR EACH OTHER PARTY BY MAIL/HAND ON 8-9-05

4



LEXSEE

**TIME WARNER CABLE OF NEW YORK CITY, a division of Time Warner
Entertainment Company, L.P., Plaintiff, - against - JOVAN NEGOVAN, Defendant.**

**99 Civ. 5910 (NG)(MDG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK**

*2001 U.S. Dist. LEXIS 15900*

**July 30, 2001, Decided**

**DISPOSITION:** [*1] Recommended that this Time Warner's motion to strike Negovan's jury demand be denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For TIME WARNER CABLE OF NEW YORK CITY, plaintiff: Daniel J. Lefkowitz, Lefkowitz, Louis & Sullivan, LLP, Jericho, NY.

For JOVAN NEGOVAN, defendant: Ronald Cohen, New York, NY.

**JUDGES:** MARILYN DOLAN GO, UNITED STATES MAGISTRATE JUDGE. NINA GERSHON, United States District Judge.

**OPINIONBY:** MARILYN DOLAN GO

**OPINION:**

REPORT AND RECOMMENDATION

Plaintiff Time Warner Cable of New York City ("Time Warner") brings this action against defendant Jovan Negovan ("Negovan") for allegedly engaging in the unlawful sale, distribution and use of certain devices and equipment, known as "pirate" or "black box" converter-decoders, designed to intercept and unscramble Time Warner's premium and pay-per-view services, in violation of the Communications Act of 1934, *47 U.S.C. § § 553* and 605. See *Int'l Cablevision, Inc. v. Sykes & Noel, 75 F.3d 123, 133 (2d Cir. 1996).* Plaintiff, in accordance with its rights under *47 U.S.C. § § 553* and 605, has elected to recover "an award of

statutory damages...in a sum...as the court considers just" for each of defendant's violations [*2] of the Communications Act. See Plaintiff's Notice of Motion to Strike Defendant's Demand for a Jury Trial dated April 10, 2001 at 2.

In the instant motion, Time Warner seeks an order pursuant to *Federal Rule of Civil Procedure 39(a)(2)* striking Negovan's demand for a jury trial.

For the reasons set forth below, I recommend that Time Warner's motion be denied.

DISCUSSION

*Federal Rule of Civil Procedure 38(a)* states that litigants have the inviolate "right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States." Because Negovan has made a jury demand, "(t)he trial of all issues should be by jury, unless...the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States." *Fed. R. Civ. P. 39(a)(2).*

Time Warner contends that because it seeks only statutory damages in this action, neither the Communications Act nor the Seventh Amendment gives Negovan a right to a trial by jury. As the parties agree, neither of the relevant provisions of the Communications Act under which this action was commenced, [*3] *47 U.S.C. § § 553* or 605, specifically provides or abrogates the right to trial by jury. See *Joe Hand Promotions, Inc. v. Nekos, 18 F. Supp. 2d 214, 216 (N.D.N.Y. 1998).* Nor has this Court found in its examination of the legislative history any reference to whether Congress intended to permit or prohibit trial by jury. Thus, this Court must



determine whether Negovan is entitled under the Constitution to have a jury trial. See *City of Monterey v. Del Monte Dunes, Ltd., 526 U.S. 687, 708, 143 L. Ed. 2d 882, 119 S. Ct. 1624 (1999)*.

The Second Circuit has not addressed the issue of whether litigants are entitled to a jury trial where the plaintiff elects to recover statutory damages under *47 U.S.C. § § 553* and 605. Lower courts in this and other circuits are divided on this question. Compare *Nat'l Satellite Sports, Inc. v. R.S. Prashad, 76 F. Supp. 2d 1359, 1362 (S.D. Fla. 1999)* (finding no right to jury trial where statutory damages are sought under Sections 553 and 605); *Nekos, 18 F. Supp. 2d at 217* (same); *Metrovision of Livonia, Inc. v. Wood, 864 F. Supp. 675, 679 n.1 (E.D. Mich. 1994)* [*4] (same); and *Storer Cable Communications v. Joe's Place Bar & Rest., 819 F. Supp. 593, 597 (W.D. Ky. 1993)* (same), with *Nat'l Satellite Sports, Inc. v. Cotter's Lounge, Inc., 88 F. Supp. 2d 1024, 1027 (E.D. Mo. 2000)* (finding right to jury trial); *Time Warner of New York City v. Kline, 2000 U.S. Dist. LEXIS 18280* (KMW) (HBP)(S.D.N.Y. Dec. 20, 2000) (same); *Nat'l Satellite Sports, Inc., v. No Frills Rest., Inc., 15 F. Supp. 2d 1360, 1364 (S.D. Fla. 1998)* (same); and *Joe Hand Promotions, Inc. v. Blarney Stone, 995 F. Supp. 577, 579 (E.D. Pa. 1998)* (same). Two judges in this district have also issued unreported decisions in which they concluded that there is no right to a jury trial under Sections 553 and 605 once the plaintiff foregoes its right to elect actual damages. See V Cable, Inc. v. Guercio, No. 94 CV 5412 (DRH) (E.D.N.Y. Sept. 30, 1998) (attached as Exhibit B to Plaintiff's Reply Memorandum of Law ("Reply Memo")); V Cable, Inc. v. Budnick, No. 98 CV 3387 (JM) (E.D.N.Y. Nov. 18, 1999) (attached as Exhibit A to Reply Memo). In addition, a Magistrate Judge in this district recommended denying [*5] a motion for a jury trial involving a violation of the Communications Act. Time Warner Cable of New York City v. Arroyo, No. 97 CV 2643 (CBA) (CLP) (E.D.N.Y. May 9, 2000) (attached as Exhibit C to Reply Memo). For the reasons explained below, I conclude that defendant has the right to a jury trial in actions brought under Sections 553 or 605(e) of the Communications Act.

The Seventh Amendment provides for trial by jury "in Suits at common law." U.S. Const. Amend. VII; see, e.g., *Markman v. Westview Instruments, Inc., 517 U.S. 370, 376, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996); Nekos, 18 F. Supp. 2d at 216.* "Suits at common law" are "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 348, 140 L. Ed. 2d 438, 118 S. Ct. 1279 (1998)* (internal quotes omitted);

*Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989)*. To determine whether a party enforcing a statutory right is entitled to [*6] jury trial under the Seventh Amendment, a court must decide (1) whether the present action is, or is analogous to, an action that would have been brought in a court of law or equity and (2) whether the nature of the remedy sought is legal or equitable. *Tull v. United States, 481 U.S. 412, 417-18, 95 L. Ed. 2d 365, 107 S. Ct. 1831 (1987); Brown v. Sandimo Materials, 250 F.3d 120, 126 (2d Cir. 2001)*. The right to trial by jury "is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury should be scrutinized with the utmost care." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 565, 108 L. Ed. 2d 519, 110 S. Ct. 1339 (1990)* (quoting *Dimick v. Schiedt, 293 U.S. 474, 486, 79 L. Ed. 603, 55 S. Ct. 296 (1935))*.

Courts have long recognized that the right to a jury trial under the Seventh Amendment may attach "to actions enforcing statutory rights, ... if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether, 415 U.S. 189, 194, 39 L. Ed. 2d 260, 94 S. Ct. 1005 (1974).* [*7] Indeed, the Supreme Court in Feltner pointed to several recent cases in which the Court found a right to a jury trial in actions brought to enforce "modern statutory rights" unknown to 18th-century *England. 523 U.S. at 348.*

In holding that a statutory claim is akin to an action at common law, the Supreme Court has often found that the statutory claim at issue "can be said to 'sound basically in tort,' and seek legal relief." *City of Monterey, 526 U.S. at 709* (quoting *Curtis, 415 U.S. at 195-96)*. For example, in City of Monterey, the Court considered whether Section 1983 of Title 42 confers the right to a jury trial where a plaintiff claimed that the City defendant's rejection of the plaintiff's plan for development of property amounted to a regulatory taking. The Court observed that "just as common-law tort actions provide redress for interference with protected personal or property interests, § 1983 provides relief for invasions of rights protected under federal law." *526 U.S. at 709.*

Both Sections 553 n1 and 605 n2 of the Communications Act prohibit the unauthorized interception of cable services protected under federal law. [*8] As the legislative history of Section 553 reveals, Congress enacted the provision to deal with the problem of "'theft of cable service,' including 'gaining access to premium movie and sports channels without paying for the receipt of those services.'" *Int'l Cablevision, Inc. v. Sykes, 997 F.2d 998, 1003 (2d Cir. 1993)* (quoting H.R. Rep. No. 934, 98th Cong., 2d Sess.

83 (1984) ("H.R. Rep. No. 934"), reprinted in 1984 U.S. Code Cong. & Admin. News ("USCCAN") 4655, 4720). Likewise, the legislative history of the 1984 amendments to the Communications Act, which amended Section 605, makes clear that Congress intended to preserve the "broad reach of Section 605 as a deterrent against piracy of protected communications." *Int'l Cablevision, Inc. d/b/a Adelphia Cable v. Sykes & Noel, 75 F.3d 123, 130 (2nd Cir. 1996)* (quoting H.R. Rep. No. 934, at 83, reprinted in 1984 USCCAN at 4720). Theft of cable services or cable piracy are thus analogous to actions for conversion or theft of property. See *No Frills Rest., Inc., 15 F. Supp. 2d at 1363* (finding cable piracy actions analogous to tort actions).

n1 Section 553(a)(1) specifies that:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

*47 U.S.C. § 553*(a)(1). [*9]

n2 Section 605(a) provides that:

> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

*47 U.S.C. § 605*(a).

The courts that have concluded that no right to a jury trial exists under Sections 553 or 605 have rejected arguments that cable piracy actions are analogous to tort actions for conversion. See, e.g., *Nekos, 18 F. Supp. 2d at 217; Joe's Place, 819 F. Supp. at 596.* In Nekos, the court found significant that "this precise type of action did not exist in England prior to the merger of courts of law and equity," id., and observed that while "copyright, trademark, and patent infringement actions...did exist in the Eighteenth Century and were historically tried before the law courts," those cases involved infringement of a proprietary interest of the owner in a product of his own ingenuity. Id. (citing *Feltner, 523 U.S. at 348-49).* [*10]

Such reasoning is contrary to established case law, which counsels against dwelling on "an 'abstruse historical' search for the nearest 18th-century analog." *Tull, 481 U.S. at 421* (quoting *Ross v. Bernhard, 396 U.S. 531, 538 n. 10, 24 L. Ed. 2d 729, 90 S. Ct. 733 (1970)).* In Curtis, the Supreme Court expressly rejected the argument that the Seventh Amendment is inapplicable to new statutory causes of action. *415 U.S. at 193-94.* Noting that "the statute sounds basically in tort ...[and] merely defines a new legal duty," the Court found that the fair housing provisions of the Civil Rights Act of 1968, *42 U.S.C. § 3612,* conferred a right to a jury trial under the Seventh Amendment. Id. On the same reasoning, the Court has found that the Seventh Amendment guarantees a right to a jury trial in actions for breach by a union of its duty of fair representation required under a collective bargaining agreement, despite the fact that collective bargaining agreements were illegal in 18th century England. See *Chauffeurs, Teamsters & Helpers, Local No. 391, 494 U.S. at 565-66.*

Moreover, the attempts [*11] by courts to distinguish the property rights protected under the Communications Act from those under the copyright, trademark or patent laws make little sense. See, e.g., *Nekos, 18 F. Supp. 2d at 217* (characterizing the rights protected by the Act as non-exclusive rights to works in a specified geographical area and contrasting those rights to the direct ownership interests in works protected by copyright, trademark or patent); *R.S. Prashad, 76 F. Supp. 2d at 1361* (same). Holders of copyrighted, trademarked or patented works may sometimes have only limited, but nevertheless, exclusive rights to exploit or use a work in a region -- just as cable companies may have the exclusive right to distribute in a specified locale certain products which they do not solely own. See *General Instrument v. Nu-Tek Elecs. & Mfg., Inc., 1996 U.S. Dist. LEXIS 4946, 1996 WL 184794* at *2 (E.D. Pa. 1996) (holding that Section 553 is essentially a provision that protects the property interests of the holder of the contractual right to distribute from unlawful interference, reception, or use of the communication, and thereby creating an action that would have been brought before the courts [*12] of law).

The critical fact is that the statute provides a legal remedy -- i.e., damages -- for encroachment on a person's property rights. In Feltner, for example, the Court found a right to a jury trial because "actions seeking damages for infringement of common-law copyright, like actions seeking damages for invasions of other property rights, were tried in courts of law in actions on the case." *523 U.S. at 349.*

In any event, the more important inquiry under the Seventh Amendment is the nature of the relief sought. *Tull, 481 U.S. at 421.* In this regard, the provisions of the Copyright Act considered by the Supreme Court in Feltner and the sections of the Communications Act at issue herein are strikingly similar. Section 504(c)(1) of the Copyright Act authorizes imposition of statutory damages in an amount that "the court considers just" and permits the court to increase or decrease damages if "the court finds" that the infringement is willful or innocent. See *Feltner, 523 U.S. at 345* (quoting *17 U.S.C. § 504*(c)(1) and (2)) n3. The pertinent provisions of the Communications Act similarly authorize the [*13] award of statutory damages in an amount "the court considers just." *47 U.S.C. § § 553*(c)(3)(A)(ii) n4 and 605(e)(3)(C)(i)(II) n5. In addition, Section 605(e)(3)(C)(ii) n6 vests the court with discretion to increase the award of damages where "the court finds that the violation was committed willfully and for purposes of direct or indirect financial gain."

n3 Section 504(c)(1) states that:

> The copyright owner may elect...an award of statutory damages for all infringements...in a sum of not less than $ 500 or more than $ 20,000 as the court considers just.

*17 U.S.C. § 504*(c)(1).

Section 504(c)(2) states that:

> In a case where the copyright owner sustains the burden of proving...that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $ 100,000. In a case where the infringer sustains the burden of proving...that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum not less than $ 200.

*17 U.S.C. § 504*(c)(2). [*14]

n4 Section 553(c)(3)(A)(ii) provides that:

> The party aggrieved may recover an award of statutory damages for all violations...in a sum not less than $ 250 or more than $ 10,000 as the court considers just.

*47 U.S.C. § 553*(c)(3)(A)(ii).

n5 Section 605(e)(3)(C)(i)(II) provides that:

> The party aggrieved may recover an award of statutory damages for each violation of subsection (a)..in a sum of not less than $ 1,000 or more than $ 10,000, as the court considers just, and for each violation of paragraph (4)...an aggrieved party may recover statutory damages in a sum not less than $ 10,000, or more than $ 100,000, as the court considers just.

*47 U.S.C. § 605*(e)(3)(C)(i)(II).

n6 Section 605(e)(3)(C)(ii) states that:

> In any case in which the court finds that the violation was committed willfully...the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $ 100,000 for each violation of subsection (a) if this section.

*47 U.S.C. § 605*(e)(3)(C)(ii).

[*15]

In holding that Section 504 confers a legal remedy, the Feltner Court reiterated "'the general rule' that monetary relief is legal, ... and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment." *523 U.S. at 352;* see also *Martin v. City of Indianapolis, 4 F. Supp. 2d 808, 811 (S.D. Ind. 1998)* (characterizing enhanced statutory damages in copyright infringement cases as a measure intended to punish or deter deliberate infringement, "to prove that it costs less to obey the...laws than to violate them," and to teach that "one who undertakes a course of infringing conduct may neither sneer in the face of the ...owner nor hide its head in the sand like an ostrich"). In addition, the Court

recognized that civil remedies "intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo" have traditionally been enforced in courts of law. *Tull, 481 U.S. at 422.* In Tull, the Court found particularly significant Congressional statements emphasizing the need for retribution and deterrence, in addition to **[\*16]** restitution, and thus found the civil penalty provisions of the Clean Water Act to be a legal remedy. *Id. at 422-23.*

Relying on Nekos, R.S. Prashad, Metrovision of Livonia, and Joe's Place, Time Warner argues that statutory remedies provided by Sections 553 and 605 are essentially restitutionary, and thus equitable remedies for which there is no right to a jury trial. See Reply Memo at 4-5. This argument is flawed in failing to differentiate between restitution in the general sense, as a legal remedy for recovery for damages, as opposed to equitable restitution. As the Supreme Court explained in City of Monterey:

> Even when viewed as a simple suit for just compensation, we believe Del Monte Dunes' action sought essentially legal relief. "We have recognized the 'general rule' that monetary relief is legal." *Feltner, 523 U.S. at 352, 118 S. Ct. 1279* (quoting *Teamsters v. Terry, supra, at 570, 110 S. Ct. 1339).* Just compensation, moreover, differs from equitable restitution and other monetary remedies available in equity, for in determining just compensation, "the question is what has the owner lost, not what **[\*17]** has the taker gained." *Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195, 30 S. Ct. 459, 54 L. Ed. 725 (1910).* As its name suggests, then, just compensation is, like ordinary money damages, a compensatory remedy. The Court has recognized that compensation is a purpose "traditionally associated with legal relief." *Feltner, supra, at 352, 118 S. Ct. 1279.*

*Id., 526 U.S. at 710-11.*

Moreover, Time Warner overlooks the fact that because statutory damages under Sections 553 and 605 serve both punitive as well as restitutionary purposes, they are considered legal remedies. Kline, 2000 U.S. Dist. LEXIS at \*10-11. To be sure, even the minimum statutory damages of \$ 10,000 for distributing a "pirate" decoder in violation of Section 605(e)(4) (and certainly the maximum of \$ 100,000) more than compensates

plaintiff for any actual loss recoverable as restitution. As Time Warner has argued in other cases, damages awarded under these provisions should not only compensate the plaintiff for its loss, but also deter the defendant and others from future violations. See, e.g., *Time Warner Cable v. U.S. Cable T.V., Inc., 920 F. Supp. 321, 331 (E.D.N.Y. 1996);* **[\*18]** *Cablevision Systems New York City Corp. v. Faschitti, 1996 U.S. Dist. LEXIS 1212, 1996 WL 48689,* at \*2 (S.D.N.Y. Feb. 7, 1996).

The legislative history of the Cable Communications Policy of 1984 is replete with statements evidencing Congressional intent to punish and deter further unlawful interception of communications, besides making the wronged party whole. See *Cotter's Lounge, Inc., 88 F. Supp. 2d at 1026.* The House Committee noted in its report that "the Committee believes that this problem is of such severity that the federal penalties and remedies contained herein must be available in all jurisdictions (and enforceable in state or federal court) as part of the arsenal necessary to combat this threat." H.R. Rep. No. 934 at 84, reprinted in 1984 USCCAN at 4721. The House Report further stated that statutory damages may be recovered even if actual damages are also recovered. H.R. Rep. No. 934 at 85, reprinted in 1984 USCCAN at 4722. Clearly, a primary purpose of the statutory damages afforded under these provisions is to punish, and not simply to compensate the wronged party. This interest in punishment is only consistent with a legal remedy, and not an equitable one. *Cotter's Lounge, Inc., 88 F. Supp. 2d at 1026;* **[\*19]** *No Frills Rest., Inc., 15 F. Supp. 2d at 1363; Blarney Stone, 995 F. Supp. at 580;* Nu-Tek Elecs. & Mfg., Inc., 1996 WL at \*3.

Further, the 1988 amendments to the Act (which only altered the penalty provisions by increasing the amount of statutory damages available under Section 605) also reflect Congressional intent to authorize the civil penalties which serve as punitive sanctions against those who engage in piracy of satellite communications. Congress noted the "importance of stopping piracy and enhancing the ability of law enforcement authorities and aggrieved private parties to deter piracy." H.R. Rep. No. 887, 100th Cong., 2d Sess. 14 (1988), reprinted in 1988 USCCAN 5577, 5642-43. Therefore, the interest in punishing violators and deterring future instances of unlawful interception of satellite communications strongly indicates that the remedy offered by sections 605 is indeed a legal one. *No Frills Rest., Inc., 15 F. Supp. 2d at 1363.*

Moreover, the fact that plaintiff may be seeking injunctive relief, in addition to legal damages, does not defeat the right to a jury trial on the concomitant legal claims or issues. See **[\*20]** *GTFM, LLC v. TKN Sales, Inc., 2000 U.S. Dist. LEXIS 4488, 2000 WL 364871* at \*5

(S.D.N.Y.) (quoting *Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477-78, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962)).* "If a claim for damages is joined with an equitable claim, the right to a jury trial on the legal claim, including all issues common to both claims, remains intact." TKN Sales, Inc., 2000 WL at *5 (quoting *Curtis, 415 U.S. at 196).* The right cannot be abridged by characterizing the legal claim as "incidental" to the equitable relief sought. *Tull, 481 U.S. at 425* (quoting *Curtis, 415 U.S. at 196).*

To determine the amount awarded to a plaintiff for statutory damages, the Supreme Court in Feltner concluded that "there is clear and direct historical evidence that juries...in copyright cases, set the amount of damages awarded to a successful plaintiff." *523 U.S. at 355.* Therefore, the Court held that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under section 504(c) of the Copyright Act, including the amount itself." n7 Id. Because both the Copyright Act and the [*21] Communications Act provide for actual damages and profits as remedies in one section and statutory damages in another, Feltner necessarily requires a jury trial in claims for statutory damages sought under the Communications Act.

> n7 The Supreme Court in Tull delegated the determination of the amount of civil penalties to the judge. The majority opinion in Feltner noted that this aspect of the Tull decision was "arguably dicta." *Feltner, 523 U.S. at 354.* Finding that the Court in Tull was presented with "no evidence that juries historically had determined the amount of civil penalties to be paid to the Government," the Feltner Court concluded that "the awarding of civil penalties to the Government could be viewed as analogous to sentencing in a criminal proceeding." *Feltner, 523 U.S. at 355.* Thus, the Feltner Court declined to follow Tull in limiting the jury's determination to the question of liability.

## CONCLUSION

For the foregoing reasons, [*22] I recommend that Time Warner's motion to strike Negovan's jury demand be denied because the Seventh Amendment entitles Negovan to a jury trial on the claim for statutory damages under *47 U.S.C. § § 553* and 605.

A copy of this Report and Recommendation is being mailed on this date by overnight mail. Any objections must be filed with the Clerk of the Court, with a copy to the undersigned, by August 15, 2001. Failure to file objections within specified time waives the right to appeal the District Court's order. See *28 U.S.C. § 636*(b)(1); *Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).*

SO ORDERED.

Dated: Brooklyn, New York

July 30, 2001

MARILYN DOLAN GO

UNITED STATES MAGISTRATE JUDGE

**ORDER** - September 20, 2001

**GERSHON, United States District Judge:**

Magistrate Judge Marilyn D. Go, in a Report and Recommendation dated July 30, 2001, has recommended that Plaintiff's motion to strike defendant's demand for a jury trial be denied. In the absence of opposition to this report, the motion is hereby denied.

**SO ORDERED.**

**NINA GERSHON**

**United [*23] States District Judge**

Dated: Brooklyn, New York

September 20, 2001



LEXSEE

**NATIONAL SATELLITE SPORTS, INC., Plaintiff, vs. COTTER'S LOUNGE, INC., d/b/a Cotter's Lounge, & LINDA WINKELMANN, Individually and as principal of Cotter's Lounge, Defendants.**

**Case No. 4:99CV01360 CDP**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION**

*88 F. Supp. 2d 1024; 2000 U.S. Dist. LEXIS 4147*

**March 29, 2000, Decided
March 29, 2000, Filed**

**DISPOSITION:** [**1] Motion of plaintiff to strike defendant's jury demand [# 17] denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For NATIONAL SATELLITE SPORTS, INC., plaintiff: Alan J. Gelb, ALAN GELB LAW OFFICE, P.C., Cherry Hill, NJ.

For COTTER'S LOUNGE, INC., LINDA WINKELMANN, defendants: Mark H. Neill, St. Louis, MO.

**JUDGES:** CATHERINE D. PERRY, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** CATHERINE D. PERRY

**OPINION:**

**[*1024] MEMORANDUM AND ORDER**

This matter is before the Court on the plaintiff's motion to strike defendant's demand for a jury trial. For the reasons stated herein, the court will grant the defendant's demand.

**Background Facts**

Plaintiff brought this action pursuant to *47 U.S.C. § § 553* (unauthorized reception of cable service) and *605* (unauthorized publication or use of communication). It appears that plaintiff, by contract, was granted the right to distribute television access by satellite signal of the heavy-weight championship boxing match on January 16, 1999, between Mike Tyson and Francois Botha, together with all the undercard bouts (hereinafter "the event"). Defendant is a local bar that did not purchase the rights to broadcast the event. Plaintiff alleges that defendant unlawfully intercepted, [**2] received, and/or descrambled and subsequently broadcast the event in violation of *47 U.S.C. § § 553* and 605. [*1025] Plaintiff elected to recover statutory damages pursuant to the referenced violations. Defendant, in its answer, requested a jury trial. Plaintiff opposed the request for trial by jury and the issue is now before this court to decide.

**Discussion**

The issue presented to the Court is whether either party is entitled to a jury trial when statutory damages are requested for violations of *47 U.S.C. § § 553* and 605. This precise issue has never been addressed by this circuit, and therefore the Court will look to the limited number of decisions from other district courts that have attempted to resolve the issue, but have reached divergent conclusions. n1

> n1 See *National Satellite Sports, Inc. v. R.S. Prashad, 76 F. Supp. 2d 1359 (S.D. Fla. 1999)* (holding no right to jury trial); *National Satellite Sports, Inc. v. No Frills Restaurant, Inc., 15 F. Supp. 2d 1360, 1362 (S.D. Fla. 1998)* (holding right to jury trial); *Joe Hand Promotions, Inc. v. Nekos, 18 F. Supp. 2d 214 (N.D.N.Y 1998)* (holding no right to jury trial); *Joe Hand*

**EXHIBIT "*B*"**

Case 1:05-cv-10262-LTS    Document 10-3    Filed 08/09/2005    Page 2 of 3

Page 2

88 F. Supp. 2d 1024, *; 2000 U.S. Dist. LEXIS 4147, **

*Promotions, Inc. v. Blarney Stone, 995 F. Supp. 577, 578 (E.D. Pa. 1998)* (holding right to jury trial); *General Instrument Corp. v. Nu-Tek Manufacturing, Inc., 1996 U.S. Dist. LEXIS 4946, 1996 WL 184794 (E.D. Pa. 1996)* (holding right to jury trial); *Storer Cable Comm. v. Joe's Place Bar & Restaurant, 819 F. Supp. 593, 596 (W.D. Ky. 1993)* (holding no right to jury trial).

**[\*\*3]**

The right to a jury trial must be either compelled by the expressed intent of the statute or preserved under the Seventh Amendment of the Constitution. A two-step analysis to determine a party's right to a jury trial has been set out by the Supreme Court. See *Tull v. United States, 481 U.S. 412, 95 L. Ed. 2d 365, 107 S. Ct. 1831 (1987).* First, the Court must look to the applicable statute and its legislative history to determine if Congress intended there to be a jury trial right. *Id. at 417 n. 3.* Second, if the analysis of the statute itself is not determinative, then the Court must undertake a Constitutional analysis to determine if the action at issue is the same or analogous to "suits at common law" and therefore subject to a jury trial. *Id. at 417.*

In the present case, an analysis of the actual statutes and their legislative history does not shed any light on whether Congress intended there to be a right to trial by jury when statutory damages are sought. Both statutes, but for limits on the amount, are identical regarding the awarding of damages and read in pertinent part: "The party aggrieved may recover an award of statutory **[\*\*4]** damages ... as the court considers just." *47 U.S.C. § § 553*(c)(3)(A)(ii) and 605(e)(3)(A)(ii) (West 1991). The use of the word "court" in the text of the statute is not determinative of the intent of the statute to grant the trial judge discretion over statutory awards, instead of a jury. See e.g., *Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d 635, 641 (8th Cir. 1996)* (citing *Curtis v. Loether, 415 U.S. 189, 39 L. Ed. 2d 260, 94 S. Ct. 1005 (1974)).* This Court agrees with the other district courts that have held that the face of the actual statutes and their legislative history are not determinative as to whether a party has a right to a jury trial when statutory damages are sought under § § 553 or 605.

Therefore, the Court is directed to the constitutional question of whether there is a right to a jury trial. Tull has made this constitutional analysis a two part inquiry. First, the Court must decide whether the present action is, or analogous to, an action that would have been brought in a court of law or equity in 1791. *Tull, 481 U.S. at 417.* Second and more importantly, the Court must determine whether **[\*\*5]** the nature of the remedy sought is legal or equitable. *Id. at 417-18.* Because an

action for piracy of a satellite signal was not even conceivable at the time of the adoption of the Seventh Amendment, it is necessary to draw an analogy to an action that did exist in 1791 to determine how the present action **[\*1026]** would most likely have been characterized. Although neither party took the time to do a Tull type analysis of the constitutional question presented today, the Court will seek to find a relevant analogy to the present action and characterize the remedy sought.

The court in Nekos rejected an analogy to actions in copyright, trademark, and patent, which all were actions in the courts of law, because an action involving cable piracy does not involve an ingenious and original idea of the plaintiff. See *Joe Hand Promotions, Inc. v. Nekos, 18 F. Supp. 2d 214, 217 (N.D.N.Y. 1998).* However, in an unpublished opinion, the district court judge in *General Instrument v. Nutek, 1996 WL 184794* at \*2 (E.D. Pa. 1996) found the analogy between cable piracy and an interference with a property right to be persuasive. It is summarized that an **[\*\*6]** action under § 553 is essentially an action to protect the property rights of the holder of the contract right to distribute from unlawful interference, reception, or use of the communication, and therefore is an action that would have been brought before the court of law. Id. In the present case, the court is partially persuaded by both of the analogies, but is uncertain whether either of them dispose of the case properly. However, the Court need not and does not decide which analogy is proper to characterize the action since the disposition of the present issue rests more on the nature of the remedy than the nature of the cause of action. See *Tull, 481 U.S. at 421.*

The Court next turns to the characterization of the remedy of statutory damages. The plaintiff, relying on Storer, Nekos, and Prashad, asserts that the function of the statutory remedy available in § § 553 and 605 is equivalent to the remedy of restitution, which is a remedy in equity, and therefore the right to a jury trial is not guaranteed. However, the court is unpersuaded by these decisions and finds that the remedy is best characterized as a legal remedy.

Remedies that are intended **[\*\*7]** to punish, as opposed to those that are restitutionary in nature, which intend to simply extract compensation and restore the status quo, were remedies issued by courts of law, not by courts of equity. *Tull, 481 U.S. at 422.*

The legislative history of the Cable Communications Policy Act of 1984 illustrates an intent to punish and deter further unlawful interception of communications, rather than merely make the wronged party whole again. In fact, the House Report, Section 634 states, "The Committee believes that this problem is of such severity

Case 1:05-cv-10262-LTS    Document 10-3    Filed 08/09/2005    Page 3 of 3

Page 3

88 F. Supp. 2d 1024, *; 2000 U.S. Dist. LEXIS 4147, **

that the federal penalties and remedies contained herein must be available in all jurisdictions (and enforceable in state or federal court) as part of the arsenal necessary to combat this threat." HR.Rep. No. 98-934 at 84 (1984), reprinted in 1984 U.S.C.C.A.N. 4651, 4721. The use of the word "penalty" as well as the language used indicates Congress intent to punish violators and to deter future violations. E.g., *National Satellite Sports, Inc. v. No Frills Restaurant, Inc., 15 F. Supp. 2d 1360, 1363 (S.D. Fla. 1998).* Further, the House Report goes on to state that these statutory damages may be recovered even **[\*\*8]** if actual damages are also recovered. HR.Rep. No. 98-934 at 85 (1984), reprinted in 1984 U.S.C.C.A.N. 4651, 4722.

Although actual damages in cable piracy cases are consistent with the nature of restitutionary damages, the legislative history reveals an expressed intent of Congress to allow the statutory damages in addition to the actual damages. This fact supports the notion that statutory damages are to punish and not to simply compensate the wronged party. This interest in punishment is only consistent with a legal remedy, and not an equitable one, therefore this Court holds that a Tull type **[\*1027]** analysis yields actions under § § 553 and 605 to be legal, preserving the right to a jury trial under the Seventh Amendment.

The conclusion that statutory damages under § § 553 and 605 are a legal remedy is consistent with the Eighth Circuit's finding in a copyright infringement case authorizing similar statutory damages. In *Cass County Music Company v. C.H.L.R., Inc., 88 F.3d 635 (8th Cir. 1996),* the court analyzed whether there was a jury trial right when statutory damages were sought under *17*

*U.S.C. § 504*(c)(2). In Cass County, the court, faced **[\*\*9]** with a statute authorizing statutory damages in copyright infringement cases which was similar to the cable piracy statute presently at issue, held that the remedy was a legal one because of the intent of the remedy to not only make the plaintiff whole again, "but also and arguably preeminently, to punish the defendant." *Id. at 643.* n2

> n2 Following Cass County there was a split in the circuits as to whether *17 U.S.C. § 504*(c)(2) granted a jury trial right. The Supreme Court in *Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998),* resolved the split and held that the Seventh Amendment provided a jury trial right when statutory damages were sought in copyright infringement actions.

Because the remedy that is sought by plaintiff in the present case is legal in nature, the defendant is entitled to a trial by jury under the Seventh Amendment.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of plaintiff **[\*\*10]** to strike defendant's jury demand [# 17] is denied.

CATHERINE D. PERRY

UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2000.



**CHARTER COMMUNICATIONS ENTERTAINMENT I, LLC d/b/a CHARTER COMMUNICATIONS, v. INES CINTRON, Defendant. CHARTER COMMUNICATIONS ENTERTAINMENT I, LLC d/b/a CHARTER COMMUNICATIONS, v. DENNIS SOSA, Defendant. CHARTER COMMUNICATIONS ENTERTAINMENT I, LLC d/b/a CHARTER COMMUNICATIONS, v. THOMAS A/K/A TOM BURDULIS, Defendant.**

**Civil Action No. 04-40064-FDS, Civil Action No. 04-40081-FDS, Civil Action No. 04-40098-FDS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2005 U.S. Dist. LEXIS 11678*

**January 11, 2005, Decided**

**SUBSEQUENT HISTORY:** Amended by *Charter Communs. Entm't I, LLC v. Thomas, 367 F. Supp. 2d 16, 2005 U.S. Dist. LEXIS 11679 (D. Mass., 2005)*

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Charter Communications Entertainment I, LLC, doing business as Charter Communications, Plaintiff: Burton B. Cohen, Robert J. Munnelly, Jr., Murtha Cullina LLP, Boston, MA; Christopher L. Brown, Murtha Cullina Roche Carens & DeGiacomo, LLP, Boston, MA.

For Thomas Burdulis also known as Tom Burdulis, Defendant: Pro se, Worcester, MA.

**JUDGES:** F. Dennis Saylor IV, United States District Judge.

**OPINIONBY:** F. Dennis Saylor IV

**OPINION:**

**MEMORANDUM ON PLAINTIFF'S MOTIONS FOR DEFAULT JUDGMENT**

**SAYLOR, J.**

The above-captioned cases involve virtually identical allegations of cable television piracy. The cable operator, Charter Communications, has filed separate actions against three individuals, all of whom are alleged to have purchased unauthorized devices to defeat scrambling or security measures and thereby obtain premium cable television services for free. In each case, Charter has obtained an entry of default and has moved for a default judgment.

The issue in these cases is not the propriety of entering a judgment of default, but rather ascertaining the amount of damages to be assessed against the defaulting defendants. There are multiple levels of analysis that must be undertaken [*2] to accomplish that seemingly simple task. First, the Court must determine whether Charter is entitled to recover under not only *47 U.S.C. § 553*, which applies to the theft of "cable" transmissions, but also *47 U.S.C. § 605*, which applies to the theft of "radio" transmissions. The issue is not merely academic, as the latter statute provides for greater potential recovery of damages and recovery of costs and attorneys' fees as of right. The Court must then consider the amount of compensatory damages (either statutory or actual) to be awarded and the extent to which enhanced damages, attorneys' fees, costs, and injunctive relief should be awarded. To complicate matters further, the courts are in substantial disagreement as to many of the basic principles governing the resolution of those questions.

For the reasons set forth below, the Court concludes that *§ 553* applies to these cases, but not *§ 605*; that any statutory damages should be a reasonable estimate of

**EXHIBIT "C"**

2005 U.S. Dist. LEXIS 11678, *

plaintiff's actual damages and should not include any component for punishment or deterrence; that the act of purchasing and installing a descrambling device is ordinarily sufficient **[*3]**  to demonstrate "willful" conduct subject to enhanced damages; and that the use of a descrambler for home viewing of cable television programs is ordinarily sufficient to demonstrate that the act was committed for purposes of "private financial gain." The Court also finds that plaintiff is entitled to injunctive relief and an award of costs and reasonable attorneys' fees in each case.

### I. Background

The following facts are taken as true. n1 Charter is a cable operator that provides cable services to its customers. Compl. P 7. Charter customers pay a monthly fee depending upon the level of service and amount of programming they select and purchase. Compl. P 9. At all relevant times, Charter has offered basic cable channels, premium channels, such as Home Box Office, Cinemax, and Showtime, and pay-per-view channels for movies and special events. Compl. P 11. Subscribers pay fixed monthly fees for access to basic cable channels and premium channels, and pay one-time charges for access to pay-per-view selections, which vary according to the particular program selected. Compl. PP 9, 18.

> n1 Because the defendants here all have been defaulted for failure to plead or otherwise defend, they are "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated." *Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62-63 (1st Cir. 2002)* (quoting *Franco v. Selective Ins. Co., 184 F.3d 4, 9 n.3 (1st Cir. 1999))*. Before entering the default judgments, the Court may examine the complaints, taking all well-pleaded factual allegations as true, to determine their legal sufficiency. *Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002)*; *Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992)*. For the sake of convenience, and unless otherwise noted, the Court will cite only to the Cintron complaint. The other complaints do not differ in material respects except where noted.

**[*4]**

Although the complaints do not so specifically state, it appears that Charter receives radio signals sent via satellites by broadcasters and converts them into cable signals for delivery to subscribers. *See, e.g., United States v. Norris, 88 F.3d 462, 467 (7th Cir. 1996)*. The

cable signals are typically delivered by a coaxial cable directly to the subscriber's home. *Id.*

Charter's cable signals for premium channels and pay-per-view services are electronically coded or scrambled so that they must be decoded by electronic decoding equipment for the signals to be viewed clearly on a television receiver or monitor. Compl. P 12. To decode the signals, Charter provides subscribers of these services with electronic decoding equipment referred to as converters. Compl. P 13. Charter's converters are programmed from a central location to decode the signals and thereby enable the subscriber to view the purchased level of service. Compl. P 14. Charter programs each of its converters specifically to permit the subscriber to view only the level of service purchased. *Id.*

To receive pay-per-view service, the subscriber's converter box must be addressable. Compl. P 16. The **[*5]** subscriber either telephones Charter and requests to view the specific movie or event or orders that movie or event using a remote control device. Compl. P 17. Charter then programs the addressable converter box to descramble that movie or event, enabling the subscriber to receive a nonscrambled signal during the time of the broadcast. *Id.* The price of pay-per-view movies or events varies but ranges from $ 3.95 for certain movies to approximately $ 49.95 for certain sporting or other special events. Compl. P 18. Charter subscribers are billed monthly for pay-per-view movies and events ordered during the previous month. *Id.*

Unauthorized decoders or descramblers are devices that have been designed or modified to defeat the scrambling or addressable security functions of Charter's cable system. Compl. P 19. Ordinarily, a person seeking to steal cable television signals will purchase the most basic service available and use the illegal device to access premium services and pay-per-view movies and events. *See* Compl. P 9.

In connection with *AT&T Broadband v. Modern Electronics, Inc.*, 8:03-00430 (D. Neb. Sept. 17, 2002), Charter obtained business records of an entity called **[*6]** Modern Electronics. Compl. P 20. Those business records indicate that each defendant here ordered and purchased from Modern Electronics a cable theft device designed to effect the unauthorized reception of cable programming. Compl. P 21. Each defendant had also ordered only a particular level of service from Charter for the relevant time period. Compl. P 8.

None of the defendants in the three cases answered or otherwise responded to the complaint. The clerk has entered a default in each case.

### II. Legal Analysis

## A. The Applicability of *Sections 553* and *605*

Charter contends that it is entitled to recover damages under both *47 U.S.C. § 553* and *47 U.S.C. § 605*. n2 Although *§ § 553* and *605* are similar in many respects, *§ 605* provides for a greater potential recovery of damages than *§ 553*. Moreover, an award of costs and attorneys' fees is mandated for a violation of *§ 605*, but such an award is discretionary as to a violation of *§ 553*. Because any award of damages in this case will depend upon which provision of Title 47 applies, this Court must examine the applicability of both *§ 553* and *§ 605*.

> n2 Specifically, each motion for default judgment seeks the following relief: statutory damages in the amount of $ 20,000 for violations of *47 U.S.C. § § 553(a)* and *605(a)*; an order enjoining the defendant from "engaging in, aiding, abetting or otherwise promoting or supporting interception or reception of the cable television programming, service or signal of Charter"; and attorneys' fees and costs in the amount specified in an attached affidavit.

### [*7]

*Section 553* provides that "no person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." *47 U.S.C. § 553(a)(1)*. There is no question that defendants' conduct subjects them to liability under *§ 553*.

*Section 605* provides that "no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." *47 U.S.C. § 605(a)*. *Section 605* thus prohibits the unauthorized interception or reception of *radio* communications. Although Charter does not explain why defendants' interception or reception of Charter *cable* transmissions violated *§ 605*, cable operators in other cases have theorized, as set forth below, that *§ 605* applies to such actions because the intercepted cable transmissions previously had been transmitted to the cable operator via radio from satellites. [*8] *See, e.g., International Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996) [Sykes II]*.

The First Circuit has not yet decided whether theft of cable services transmitted via wire violates *§ 605*, and the Courts of Appeals that have examined the issue are split. *Compare Sykes II, 75 F.3d at 133* (concluding that

unauthorized interception of cable transmissions violates both *§ § 553* and *605*), *with Norris, 88 F.3d at 469* (holding that theft of cable services does not violate *§ 605*), *and TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 197 (3d Cir. 2001)* (same).

Reported decisions from District Courts in this circuit reveal a similar split. *Compare Century ML-Cable Corp. v. Diaz, 39 F. Supp. 2d 121, 123-24 (D.P.R. 1999)* (stating that both *§ 553* and *§ 605* prohibit the sale of illegal cable theft devices), *and United States v. Beale, 681 F. Supp. 74 (D. Me. 1988)* (same), *with Kingvision Pay-Per-View, Ltd. v. Rocca, 181 F. Supp. 2d 29 (D.N.H. 2002)* (concluding that *§ 605* does not encompass cable theft), *and TCI Cablevision of New Eng. v. Pier House Inn, Inc., 930 F. Supp. 727, 734 (D.R.I. 1996)* [*9] (same).

For the reasons discussed below, the Court concludes that the defendants' actions do not violate *§ 605*. The Court first will analyze the language and history of *§ 605* and then will examine the reasoning of the courts in *Sykes II, Norris*, and *TKR Cable*.

"The starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 64 L. Ed. 2d 766, 100 S. Ct. 2051 (1980)*; *accord Arnold v. United Parcel Serv., Inc., 136 F.3d 854, 857 (1st Cir. 1998)*. As noted, *Section 605* applies to the interception of "any interstate or foreign communication by radio." *47 U.S.C. § 605(a)*. The term "communication by radio" is defined under the statute to mean the "transmission by radio of . . . signals . . . of all kinds. . . ." *47 U.S.C. § 153(33)*. n3 *Section 605* does not, however, refer to the interception of a "communication by wire," which is also a defined term. *Section 153(52)* provides that "communication by wire" means transmission of "signals . . . of all kinds . . . by aid of wire, cable, or other like connection." n4 It thus seems obvious that *§ 605* [*10] was intended to apply only to the interception of *radio* communications and not to the interception of *wire* communications, which is defined to include *cable* transmissions.

> n3 The full definition is as follows:
>
> The term "radio communication" or "communication by radio" means the transmission by radio of writings, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of

communications) incidental to such transmission.

*47 U.S.C. § 153(33).*

n4 The full definition is as follows:

The term "wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

*47 U.S.C. § 153(52).*

[*11]

If this were a case of first impression, the Court would simply conclude that the language of *§ 605* does not apply to the theft of cable services, without further inquiry. *See Arnold, 136 F.3d at 858* (observing that a district court need not consult other interpretive sources where a statute's plain meaning is clear). Nevertheless, this Court is not writing on a clean slate, and, as the courts that previously have considered the issue are split, the Court will address the issue in greater detail.

From the very onset of government regulation of radio broadcasting, Congress has drawn a clear distinction between radio transmissions and wire transmissions. *See Norris, 88 F.3d at 464.* The Communications Act of 1934, ch. 652, 48 Stat. 1064, now codified in relevant part at *47 U.S.C. § 605(a)*, established the Federal Communications Commission and granted the newly created commission jurisdiction over wire and radio transmissions. *Id. at 464-65.* In 1968, Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 (Crime Control Act) to regulate the interception of wire and oral communications. Pub. L. [*12] No. 90-351, 82 Stat. 197. The Crime Control Act amended *§ 605*, removing all references to wire communications except the first clause of *§ 605(a)*, which prohibited telecommunications personnel from publishing or divulging wire and radio transmissions. *Norris, 88 F.3d at 465.* After that amendment, *§ 605* generally continued to apply to "radio transmission[s]." *Id.*

The adoption of the Crime Control Act left a regulatory gap whereby theft of cable services, which involved a form of wire interception, was not explicitly covered in any statute or regulatory scheme. *Id.* To fill the gap, Congress eventually enacted *47 U.S.C. § 553(a)* as part of the Cable Communications Policy Act of 1984, Pub. L. No. 98-549, § 2, 98 Stat. 2779, 2796. *Id. Section 553(a)(1)* expressly prohibits the interception or unauthorized reception of "any communications service offered over a cable system."

That evolution of the statutory scheme reinforces the conclusion that is apparent from the text of the statute: Congress intended *§ § 553* and *605* to address different types of interceptions. Nevertheless, the courts do not unanimously concur with that interpretation. [*13]

In *Sykes II*, the Second Circuit, the first Court of Appeals to face the question, held that distributors of cable theft devices are liable under both *§ 553* and *§ 605*. The court reasoned that the devices ultimately are used to intercept radio communication, even if the radio communication is transmitted by cable at the point of interception. *75 F.3d at 131.* The court acknowledged that Congress amended *§ 605* in 1968 to remove all references to wire communications and that this legislative action could be read as eliminating the applicability of *§ 605* to cable-television theft. *Id. at 130.* Nevertheless, the court rejected such an interpretation, relying on pre-1984 decisions applying *§ 605* to cable theft and a passage of the legislative history the court interpreted as adopting the reasoning of those decisions.

As the court in *Sykes II* observed, several District Court cases decided before the enactment of *§ 553* in 1984 had interpreted *§ 605* as affording protection to television signals transmitted via coaxial cable. *75 F.3d at 130-32* (describing such cases). These cases, the court stated, provided a "plausible interpretation" [*14] of the [pertinent portion] of *§ 605*: "the continued transmission of radio signals via cable after their receipt at the headend of a cable television system can be regarded as the 'receipt, forwarding, and delivery of [radio] communications . . . incidental to [the transmission]' of those communications within the meaning of *§ 153(b)*." *Id. at 131* (citing *Cablevision Sys. Dev. Co. v. Annasonic Elec. Supply, 1984 U.S. Dist. LEXIS 19592, No. CV-83-5159 (E.D.N.Y. Feb. 10, 1984), incorporated in Ciminelli v. Cablevision, 583 F. Supp. 158, 164 (E.D.N.Y. 1984)).* n5 As Congress is presumed to have been aware of the District Courts' interpretation of *§ 605(a)* and reenacted the statute without change, the court concluded that their interpretation may be deemed to have been adopted by Congress. *Id.*

n5 One commentator casts doubt on these pre-1984 decisions as "probably making a virtue out of a necessity, as *Section 605* had been drafted to cover over-the-air communications and did not address the particular issue of cable transmission." Daniel L. Brenner et al., *Cable Television and Other Nonbroadcast Video* § 5:84 (2004); *see also Norris, 88 F.3d at 468* (describing the pre-1984 cases as attempts to "judicially fill the gap created by the [Crime Control Act] by extending *§ 605(a)* to cover the interception of cable programming over a cable network"); *Pier House Inn, 930 F. Supp. at 736* (questioning whether Congress should be deemed to have adopted the reasoning of the District Court cases cited in *Sykes II* because "[a] close reading of [those] cases . . . reveals that the issues raised varied in several important respects from those raised in both *Sykes II* and in this case.")

**[*15]**

The *Sykes II* court found this interpretation to be "strongly fortified" by a portion of the legislative history of *§ 553*:

> *Section 605 of the Communications Act of 1934* includes a prohibition against the unauthorized reception of communications services. *Nothing in [§ 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service. . . .* Situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, *continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*

*Id. at 131-32* (quoting H.R.Rep. No. 934 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 (emphasis added)). The court concluded that (1) the first emphasized passage indicated that *§ 605* would continue to apply to cable theft; and (2) the second emphasized passage established the exclusive applicability of *§ 605* to the interception of radio signals before **[*16]** they are retransmitted over a cable network but did not bar the section's application to cable theft. *Id. at 132.*

Just months after the opinion in *Sykes II*, the Seventh Circuit reached an opposite result, holding that cable-television programming transmitted over a cable network is *not* a radio communication actionable under *§ 605*. *Norris, 88 F.3d at 469*. n6 The government offered two arguments as to why cable transmissions are "radio" communications: (1) because wire transmissions technically are radio waves delivered through a conducting cable, and (2) because a cable company's reception and forwarding of programming received as radio transmissions onto its cable network are "merely incidental" to the original radio transmissions. *Id. at 467.* The *Norris* court rejected both arguments. As to the former, the court stated that the argument "impermissibly conflates the definitions of wire and radio communications under Title 47 -- definitions which for over eighty years Congress has treated as distinct and mutually exclusive." *Id. at 467*. As to the latter, the court similarly noted that if it accepted the government's **[*17]** position, it would "unacceptably blur[]" the line between radio and wire communications. *Id. at 467-68.* n7 The *Norris* court also noted that the government's position would render much of the regulatory scheme "meaningless." *Id. at 468.*

> n6 Although *Norris* was a criminal prosecution rather than a civil lawsuit, the applicable statutory language and analysis are the same in both contexts.
>
> n7 The court also noted that cable companies not only route the radio and satellite transmissions over their cable networks but also combine the various transmissions, sort them into channels, and retransmit them over their own networks, actions that cannot be considered to be merely incidental to the original transmissions. *Id.*

After examining the statutory meaning of "wire" and "radio" communications, the court in *Norris* considered Congress's intent in enacting *§ 553*. *Id. at 468*. The court reasoned that if Congress intended *§ 605* to cover the theft of **[*18]** satellite-and radio-originated cable transmissions, the only additional conduct covered by *§ 553* would be the theft of local cable programming that originates from the cable provider. *Id.* The court determined that, more logically, *§ 605* was meant to cover interceptions of programming traveling through the air, and *§ 553* was meant to cover interceptions of programming traveling over cable wire. *Id.* Finally, the *Norris* court concluded that the court in *Sykes II* had misinterpreted the legislative history of *§ 553* by taking

passages out of context and assigning to them meanings at odds with the section's purpose. *Id.*

Five years after *Norris*, the Third Circuit also held that *§ 605* does not apply to cable theft because it does not involve the interception of radio communications. *TKR Cable, 267 F.3d at 197*. In particular, the court agreed with the Seventh Circuit in *Norris* that if *§ 605* applied to all communications that were at one point transmitted via radio waves, Congress's excision of wire communication from *§ 605* in 1968 would be meaningless. *Id. at 202*.

The court in *TKR Cable* found support for its decision [*19] in the legislative history of *§ 553*. *Id. at 203*. First, the impetus behind the creation of *§ 553* was the economic impact of the then-novel phenomenon of cable piracy. *Id.* Second, Congress knew when it enacted *§ 553* that much cable programming is delivered via satellite, and, therefore, it would not have engaged in extensive discussion of the large and economically significant problem of cable piracy if *§ 605* already addressed it (and if *§ 553* was meant to apply to local cable programming only). *Id. at 205.* n8

> n8 The authors of a cable treatise agree with *Norris* and *TKR Cable* that "*section 605* should be read to govern when the piracy involves airborne signals, including those on their way for retransmission by a cable operator . . . once the signals have been received at the head-end, though, any later theft should only involve Section 633 [*47 U.S.C. § 553*]." Brenner et al., *supra*.

The Court finds the reasoning *of Norris* and [*20] *TKR Cable* to be persuasive, and accordingly concludes that *§ 605* does not apply to theft of cable programming by a subscriber using a descrambler device. That conclusion is substantially more faithful to the statutory text, which distinguishes "service offered over a cable system," *§ 553(a)*, from "communication by radio," *§ 605(a)*. As both courts observed, if both *§ 553* and *§ 605* apply to theft of cable programming, the only additional conduct covered by *§ 553* is the theft of local cable programming; it seems extremely unlikely that Congress intended the statute to cover such a narrow range of conduct. Although legislative history should be considered with great caution, here the evidence is overwhelming that Congress intended *§ 553* to address the serious, widespread problem of cable piracy, not a microscopically small range of conduct.

That interpretation also comports with logic and common sense. Unless the words are completely

disconnected from their ordinary meanings, a radio communication is simply not the same thing as a cable communication, even though an electrical engineer might say that a cable signal technically contains radio waves. The change in the mode of [*21] transmission, by cable instead of through the air, changes the applicability of the relevant statute.

For the reasons stated above, the Court concludes that *§ 605* does not apply to the theft of communications transmissions over a cable wire.

**B. Compensatory Damages**

**1. Methodology for Determining Statutory Damages**

Having concluded that Charter may proceed only under *47 U.S.C. § 553*, the Court next must determine the amount of damages to which Charter is entitled in each case.

*Section 553* permits the Court to award, among other things, either actual damages or statutory damages to a successful plaintiff. In relevant part, the section provides:

> Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:
>
> (i) the party aggrieved may recover the actual damages suffered by him . . . or
>
> (ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than \$ 250 or more than \$ 10,0000 as the court considers just.

*47 U.S.C. § 553(c)(3)(A)*. The statute provides no guidance as [*22] to the determination of statutory damages, leaving the matter to the Court's discretion. Charter seeks statutory damages in the amount of \$ 10,000, the maximum permissible, for each defendant's violation of *§ 553*.

In *Comcast of Massachusetts I, Inc. v. Naranjo*, Judge Keeton of this District addressed the problem of how to calculate statutory damages under *§ 553* in a case involving cable piracy for private home use. *303 F. Supp. 2d 43 (D. Mass. 2004)*. The cable provider had encouraged the court to consider a number of factors in calculating statutory damages, including "the willfulness of defendant's violation, the importance of 'general and specific' deterrence, defendant's cooperation with plaintiff, and actual damages in determining the appropriate award of statutory damages." *Id. at 47*. The court, however, rejected Comcast's factor-based analysis,

concluding that statutory damages should be "as reasonable an estimate of actual damages as the facts . . . allow," not greater. *Id.*

The court observed that the plain language of *§ 553* provides that actual damages and statutory damages are "coordinate alternatives," with no difference or preference [*23] between them. *Id.* It also noted that the deterrent effect plaintiff sought to build into statutory damages actually was served by other subsections of *§ 553*, which provide enhanced damages for willfulness and an injunction to prevent future violations. *Id. at 48-49.* Finally, the court explained that to build deterrence damages into statutory damages would lead to an absurd result:

> Under plaintiff's theory, an aggrieved party may receive as statutory damages premiums to deter future conduct in addition to actual or estimated actual damages. Statutory damages, however, may not exceed $ 10,000. As a result, parties that have suffered large actual damages (greater than $ 10,000) cannot receive deterrence premiums. But if any violators require an additional deterrence premium, it is those who have caused the largest amounts of harm.

*Id. at 49.* Accordingly, the court concluded that it should award as statutory damages as reasonable an estimate of actual damages as the facts would allow. *Id.*

To arrive at that estimate, the court took the monthly charge for the premium cable service defendant was receiving illegally and subtracted [*24] from it the amount defendant paid for basic cable service. The court then considered the cost of pay-per-view programming. It observed:

> Plaintiff offers no reasonable estimate of damages, stating only that the cost of all services could total over $ 500 a month. But no defendant could partake of all the cable services made available by the illegal descrambler, nor do I find it plausible that a defendant would order pay-per-view services 24 hours a day, every day of the month.

*Id.* Independently, then, the court determined that ten pay-per-view movies and four "additional pay-per-view selections" per month were reasonable and added the cost of these services to arrive at a total estimated monthly figure. n9 Finally, it multiplied by the number of months cable was intercepted to arrive at a statutory damage amount of $ 2,780. *Id.*

> n9 Compare *Cablevision Systems New York City Corp. v. Rosa*, where the court concluded that one special event and seven pay-per-view movies per month were reasonable given the "limitations that taste, viewing preference, programming selection and time placed on [defendant's] viewing." *2002 U.S. Dist. LEXIS 6140, 2002 WL 1446942, at *5 (S.D.N.Y. 2002).* The court acknowledged that any estimate of the value of the pay-per-view programming that defendant intercepted would be somewhat arbitrary. *Id.*

[*25]

The approach used by other courts has varied widely. Some courts have used statutory damages to approximate actual damages, as in *Naranjo*, but also included additional sums to deter future violations, the approach that *Naranjo* rejected. *See, e.g., Rosa, 2002 U.S. Dist. LEXIS 6140, 2002 WL 1446942, at *5* (opining that damages should be calculated to deter future misconduct and to avoid granting defendants a windfall); *Joe Hand Promos., Inc. v. Salinetti, 148 F. Supp. 2d 119, 120-23 (D. Mass. 2001)* (multiplying approximate actual damages by five to reach statutory damages, reasoning that the defendants should pay more than just restitution costs); *Mountain Cable Co. v. Choquette, 53 F. Supp. 2d 107, 112 (D. Mass. 1999)* (awarding $ 3,000 in statutory damages where a landlord distributed illegally intercepted cable to two apartment units and his own residence, noting that the sum reflected the "seriousness of defendant's violation balanced against the relatively small scale of his illegal activity").

Other courts have awarded a flat sum rather than attempting to approximate actual damages. Some courts have awarded the statutory maximum where the defendants [*26] have defaulted, failed to contest damages, showed willful conduct, or stole services valued near the maximum damage award. *See, e.g., Community Television Sys., Inc. v. Caruso, 134 F. Supp. 2d 455, 460-01 (D. Conn. 2000)* (awarding $ 10,000, the maximum damages under *§ 605*, where defendant made it as difficult as possible for the plaintiff to vindicate its rights); *Cablevision Sys. N.Y. City Corp. v. Lokshin, 980 F. Supp. 107, 113 (E.D.N.Y. 1997)* (awarding the maximum damages of $ 10,000 because plaintiff's reasonable estimate of the value of programming defendant received over six years was $ 9,000). n10

Case 1:05-cv-10262-LTS   Document 10-4   Filed 08/09/2005   Page 8 of 14

n10 Still other courts have awarded flat sums without revealing their reasoning. *See, e.g., Diaz, 39 F. Supp. 2d at 125* (stating that $ 10,000, the maximum damages under *§ 553* and the minimum under *§ 605*, for each of 750 violations, was a "just figure"); *Pier House Inn, 930 F. Supp. at 737* (awarding $ 5,000 in statutory damages for a violation of *§ 553*); *Cablevision Sys. Corp. v. Muneyyirci, 876 F. Supp. 415 (E.D.N.Y. 1994)* (awarding the statutory minimum per sale for 390 violations).

**[*27]**

Some courts have decreased damage awards when the defendant cooperated by surrendering unauthorized devices. *See Charter Communications Entm 't I, LLC v. Shaw, 163 F. Supp. 2d 121, 125 (D. Conn. 2001)*. Some have decreased awards on the grounds that the defendant's offense was considered minor. *See Kingvision Pay-Per-View v. Langthorne, 2001 U.S. Dist. LEXIS 20721, 2001 WL 1609366, at *1 (D. Mass. 2001)* (awarding the statutory minimum in "a case involving a single unauthorized broadcast . . . by one small establishment that did not even charge its patrons a cover"); *Time Warner Cable of N.Y. City v. Barnes, 13 F. Supp. 2d 543, 548 (S.D.N.Y. 1998)* (awarding the statutory minimum of $ 1,000 when the defendant purchased a single cable theft device); *Time Warner Cable of N.Y. City v. Olmo, 977 F. Supp. 585 (S.D.N.Y. 1997)* (awarding the statutory minimum for each sale where the defendant sold only two cable theft devices).

This Court is persuaded that Judge Keeton's approach in *Naranjo* best satisfies the command of the statute and the judicial interest in promoting predictability and transparency. As Judge Keeton observed, statutory damages should **[*28]** be a reasonable estimate of actual damages; any deterrent effect should be created through an award of enhanced damages and attorneys' fees, not by inflating compensatory damages. The Court will therefore apply the approximation method rather than the flat-sum method, and limit statutory damages to a reasonable approximation of actual damages without a deterrence premium.

There remains the troublesome question of where to set the statutory damage amount. As in *Naranjo*, Charter has estimated its actual damages by claiming the amount of pay-per-view service defendants potentially *could* watch, rather than the amount a reasonable or average viewer, even one receiving service for free, *would* watch. Even in an era where the number of hours spent by the average American watching television has reached staggering proportions, there are, nonetheless, practical limits. Those who steal cable television presumably must

sleep, eat, bathe, go to work, shop, and otherwise go about their daily lives. When they watch television, some of the time they presumably spend watching basic cable (for which they have paid) and premium cable (which they are stealing, but which is sold at a fixed **[*29]** monthly price). It is only, then, the amount of the additional stolen pay-per-view signals that the Court must attempt to estimate.

Charter has not submitted any evidence to assist the Court in this determination -- for example, evidence, expert or otherwise, as to the viewership habits of the average cable subscriber or the average pay-per-view subscriber, or as to the impact on pay-per-view usage when the service is provided for free. The Court is thus left to estimate such viewership without any guideposts, or even a base point from which to begin. In the absence of such evidence, the Court will simply adopt the assumptions of Judge Keeton: the Court finds that ten pay-per-view movies at standard rates and four "additional pay-per-view selections" at higher rates per month is a reasonable estimate. It will therefore add the cost of these services to arrive at a total estimated monthly figure. n11 In addition to appearing to be plausible on its face, that approach has the virtue of consistency between two sessions of the same court. Should Charter, in a future case, come forward with evidence suggesting that the figure is too low or too high, the Court may revise its estimate accordingly. **[*30]**

> n11 According to Charter, standard pay-per-view movies cost $ 3.99; adult pay-per-view movies cost $ 6.99; and the company occasionally airs special pay-per-view events at prices between $ 5.95 and $ 59.95. Judge Keeton awarded Comcast damages for four "additional pay-per-view selections" at the adult-movie price, without distinguishing between adult movies and special events or estimating a separate number of pay-per-view special events. *See Naranjo, 303 F. Supp. 2d at 49*. That result is somewhat arbitrary, but reasonable in light of the fact that Charter, which has the burden or proving its damages, has not provided any information about the price, frequency, or viewership of special events actually made available during the relevant time period.

### 2. Amount of Statutory Damages

#### a. Cintron

Charter seeks damages against Cintron for a 51-month period dating from April 2000 to July 2004. n12 Charter alleges that the cost of illegally intercepted

premium programming for that [*31] period was $ 40 per month ($ 10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $ 2,000 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $ 3.99 each and four additional pay-per-view movies per month at $ 6.99 each, for a total of $ 3,393 in illegally intercepted pay-per-view programming for the entire 50-month period. Therefore, Cintron will be ordered to pay $ 5,393 in statutory damages.

> n12 Charter seeks damages from Cintron for the period April 2000 through July 2004, which is either 50, 51, or 52 months, depending upon the starting and ending dates of the calculation. Although Charter describes that period variously as "approximately four years and three months [i.e., 51 months]" and as "50 months," the Court has treated it as 51 months.

### b. Sosa

Charter seeks damages against Sosa for a 48-month period dating from August 2000 to August 2004. Charter alleges that the cost of illegally intercepted [*32] premium programming for that period was $ 40 per month ($ 10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $ 1,920 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $ 3.99 each and four additional pay-per-view movies per month at $ 6.99 each, for a total of $ 3,257.28 in illegally intercepted pay-per-view programming for the entire 48-month period. Therefore, Sosa will be ordered to pay $ 5,177.28 in statutory damages.

### c. Burdulis

Charter seeks damages against Burdulis for a 48-month period dating from August 2000 to August 2004. Charter alleges that the cost of illegally intercepted premium programming for that period was $ 40 per month ($ 10 each for The Movie Channel, Showtime, HBO, and Cinemax), for a total of $ 1,920 for the entire period. Additionally, as explained above, Charter will be awarded damages for ten pay-per-view movies per month at $ 3.99 each and four additional pay-per-view movies per month at $ 6.99 each, for a total of $ 3,257.28 in illegally intercepted pay-per-view programming for the entire 48-month period. Therefore, Burdulis will be [*33] ordered to pay $ 5,177.28 in statutory damages.

### C. Enhanced Damages

In addition to compensatory damages, Charter seeks enhanced damages under the statute. *Section*

*553(c)(3)(B)* provides for enhanced damages of up to an additional $ 50,000 where the "court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain." Two findings -- willfulness *and* either commercial advantage or private financial gain -- are thus required.

### 1. Willfulness

The term "willful" is not defined in the statute. It has been defined in the context of alleged Cable Act violations as "a disregard for the governing statute and an indifference to its requirements." *Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 851 (11th Cir. 1990)*.

Courts generally have been imprecise in assessing willfulness, often assuming it rather than finding it in any reasoned way. This tendency may be due to the nature of the violation: even garden-variety cable piracy (i.e., purchasing and hooking up an unauthorized device) could be considered willful because it requires affirmative illegal steps to be taken. As one [*34] court noted, "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems." *Time Warner Cable v. Googies Luncheonette, Inc., 77 F. Supp. 2d 485, 490-91 (S.D.N.Y. 1999), quoted in Salinetti, 148 F. Supp. 2d at 123*. n13 The Court agrees that, in the ordinary case, the act of acquiring and installing a descrambling device is sufficient to demonstrate a willful violation. But there nonetheless must be a distinction between willful and non-willful violations, or the term "willful" has no meaning. n14

> n13 *See also King Vision Pay-Per-View Corp. v. Tardes Calenas Moscoro, Inc., 2004 U.S. Dist. LEXIS 3796, 2004 WL 473306, at *4 (S.D.N.Y. 2004)* ("In order for [defendant] to access the telecast, it would have been necessary to use an unauthorized decoder, to make misrepresentations identifying [defendant] as a residential customer, or to illegally divert cable service or satellite signals. . . . The illegality of any of these actions would have been apparent to the perpetrator."); *Kingvision Pay-Per-View, Ltd. v. Recio, 2003 U.S. Dist. LEXIS 10440, 2003 WL 21383826, at *5 (S.D.N.Y. 2003)* ("The defendants' actions were willful since they each took an affirmative action to illegally intercept [the] broadcast."); *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001)* (finding willfulness because "to access the telecast, it would have been necessary to use an unauthorized decoder, to illegally divert cable service into the store, or improperly relocate an authorized decoder[,] . . . the illegality

of [which] would have been apparent to the perpetrator."); *Lokshin, 980 F. Supp. at 114* (concluding defendant's "conduct undoubtedly was willful since he took measures to purchase and install an unauthorized descrambler"). **[*35]**

n14 In other words, the statute necessarily proscribes other types of conduct that are not "willful," or the distinction is meaningless. An example of a possible non-willful violation would be a situation in which an adult child gave a descrambler to his unsophisticated elderly parent and told the parent that he was paying all relevant charges to the cable company. The parent would thus be unlawfully receiving cable transmissions, but under circumstances that were not "willful."

Some courts have gone further and concluded that defendant's default in the litigation is itself evidence of willfulness. *See, e.g., Salinetti, 148 F. Supp. 2d at 122* (citing *Olmo, 977 F. Supp at 589* ("The court may draw an inference of wilfulness from a defendant's failure to appear and defend an action in which the plaintiff demands increased statutory damages based on allegations of willful conduct.")); *see also Rosa, 2002 U.S. Dist. LEXIS 6140, 2002 WL 1446942, at *5* (concluding defendant's default, among other things, demonstrated a willful disregard for the *Cable Act); Diaz, 39 F. Supp. 2d at 125* **[*36]** ("Defendant's civil contempt and default alone may be viewed as evidence of willfulness."); *Lokshin, 980 F. Supp. at 114* ("[The] default itself could further be viewed as evidence of willfulness."). *But see Langthorne, 2001 U.S. Dist. LEXIS 20721, 2001 WL 1609366, at *1* (inferring willfulness from a defendant's default alone is "extremely problematic") (citing *Entertainment by J&J, Inc. v. Perez, 2000 U.S. Dist. LEXIS 9280, 2000 WL 890819, at *2 (N.D. Cal. 2000)* (holding that the mere assertion that a defaulted defendant acted willfully was insufficient to justify enhanced damages)); *Kingivision Pay-Per-View, Ltd. v. Arias, 2000 U.S. Dist. LEXIS 162, 2000 WL 20973, at *2 (N.D. Cal. 2000)* (concluding that allegations of willfulness alone were insufficient to support finding of willfulness against defaulted defendant).

This Court does not agree that the act of defaulting is relevant to the willfulness finding. A finding that default is relevant implicitly suggests that the defendant is somehow contumaciously defying the plaintiff and the Court, similar to a criminal defendant who flees the jurisdiction rather than face prosecution. This view places far too much weight on an event that is nearly

always **[*37]** ambiguous. There are many reasons why a defendant might default in a civil case-for example, because the defendant had moved away and the plaintiff could not locate him; because the defendant had no money for counsel and was not aware of his right to proceed *pro se*; or because the defendant did not speak English and did not understand the nature of the papers served upon him. Furthermore, unlike the flight of an accused criminal, a civil default imposes no particular hardship on the plaintiff or the Court. The plaintiff is not required to devote substantial resources to litigation, incurs no litigation risk, and generally obtains a very favorable judgment with little effort. Although plaintiff loses the opportunity to take discovery from the defendant, the availability of statutory damages makes that issue relatively insignificant. Also, while it is true that the plaintiff must find the defendant to enforce its default judgment, that is significant only where the defendant would be able to pay it; it seems highly probable that the great majority of defaulting defendants do not have meaningful assets with which to pay a judgment.

In any event, the Court finds that, under ordinary **[*38]** circumstances, the acts of purchasing a descrambler and installing it are sufficient, standing alone, to demonstrate willfulness. A descrambler has no legal use, and it would be unusual, to say the least, for a person to use such a device non-willfully. The allegations in the complaints therefore satisfy the first element of the standard for enhanced damages under *47 U.S.C. § 553(c)(3)(B).*

## 2. Private Financial Gain

The second element that must be established for enhanced damages is that the violation was committed "for purposes of commercial advantage or private financial gain." *47 U.S.C. § 553(c)(3)(B).* There is no issue in these cases of commercial advantage, so the question becomes whether the violations were committed for private financial gain.

Like the term "willful," the phrase "private financial gain" is not defined in *§ 553.* In pertinent part, *§ 553* provides:

> In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages.

*Id.* By way of comparison, an **[*39]** almost identical provision is found in *§ 605:*

In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages.

*47 U.S.C. § 605(e)(3)(C)(ii). Section 605*, however, goes on to restrict the term "private financial gain" as follows:

> The term "private financial gain" *shall not include* the gain resulting to any individual for the private use in such individual's dwelling unit of any programming for which the individual has not obtained authorization for that use.

*47 U.S.C. § 605(d)(5)* (emphasis added). *Section 553*, enacted after *§ 605*, contains no such restriction. It seems clear, as evidenced by the difference in the statutes, Congress intended to exclude from the definition of "private financial gain" the gain resulting from an individual's private home use in *§ 605*, but not in *§ 553*. As a consequence, the gain resulting from an individual's private home use *does* constitute "private financial gain" under *§ 553*.

There is little case law [*40] discussing this point; what exists reveals two opposing views from the Eastern District of New York.

*In American Cablevision of Queens v. McGinn, 817 F. Supp. 317, 320 (E.D.N.Y. 1993)*, the court declined to award enhanced damages where the defendant illegally modified his cable box on the grounds that such conduct did not constitute "private financial gain." Although the court did not discuss the differences between *§ § 553* and *605*, the court observed that anyone who uses a device to obtain cable illegally is reaping "private financial gain." *Id.* But the court reasoned that if this interpretation were correct, there would be no reason for a separate section to enhance damages for violations for "private financial gain," because all violations would be enhanced. *Id.; see also Time Warner Cable of N.Y. v. Rivera, 1995 U.S. Dist. LEXIS 22138, 1995 WL 362429, at \*4 (E.D.N.Y. 1995)* (following *McGinn* in refusing to award enhanced damages for "private financial gain" where defendant tampered with her home cable box).

The court in *Lokshin*, by contrast, focused on the fact that *§ 605(d)(5)* specifically excludes from the definition of "private financial gain" any unauthorized [*41] private home use, but *§ 553(c)(3)(B)* contains no parallel exclusion. *980 F. Supp. at 112*. The court concluded that in the absence of such a qualification in *§ 553*, the plain statutory meaning of "private financial gain" includes unauthorized private home use. *Id. at 114*.

Accordingly, the court considered Lokshin's savings in cable fees to be "private financial gain" under *§ 553* and awarded enhanced damages. *Id. at 115; see also Rosa, 2002 U.S. Dist. LEXIS 6140, 2002 WL 1446942, at \*5* (awarding enhanced damages against a defendant for his unauthorized private use at home). n15

> n15 The *McGinn* court had found that "private financial gain" under *§ 553* applies only when the defendant sells an illegal device or intercepts a signal for a public showing. *817 F. Supp at 320*. The *Lokshin* court rejected that argument as inconsistent with the plain meaning of the statute, and similarly rejected the argument that such a reading of *§ 553* would subsume all conduct that violated the statute. *980 F. Supp at 114*. The court provided two examples of violations of *§ 553* without "private financial gain": (1) an individual who assists in the installation of an unauthorized device, triggering *§ 553(a)*, but who does not receive any compensation, and (2) a manufacturer who attempts to distribute illegal cable theft devices but is apprehended before making its first sale. *Id.*

[*42]

The Court agrees with the reasoning of the *Lokshin* court. An individual's use of a descrambler to obtain cable programming without paying for it constitutes "private financial gain" within the meaning of the statute, absent unusual circumstances not apparently present here. The plain meaning of "private financial gain" and the fact that Congress excluded private home use from the definition of the phrase in *§ 605*, but not *§ 553*, both strongly support that conclusion.

That interpretation is potentially problematic only because it is so broad that many or most violations of *§ 553* would be subject to an award of enhanced damages. This result appears to be consistent with the statutory scheme, however. Because statutory damages should approximate actual damages with no deterrence premium, most, if not virtually all, violations *should* be subject to enhancement for deterrence purposes. n16

> n16 For this interpretation to be completely coherent, there must exist a category of violations that are willful but not undertaken for either "commercial advantage" or "private financial gain." The *Lokshin* court provided two examples, set forth in footnote 14 above. A third possible example would be a person who purchases and

installs a descrambler for the benefit of disabled children at an orphanage; the person has committed a willful violation, but presumably has obtained neither commercial advantage nor private financial gain from the transaction, only personal satisfaction.

[*43]

Because both elements for enhanced damages have been established under § 553, the issue then becomes determining the amount of the award.

### 3. Methodology for Determining Enhanced Damages

The courts are also in disagreement as to how to determine the amount of any enhanced damages. Some courts have awarded minimal enhanced damages where the violation was relatively small in scale. *See, e.g., Olmo, 977 F. Supp at 590* (awarding $ 1,000 in enhanced damages for two offenses based on the small scale of the unauthorized modification scheme). n17 At the other extreme, some courts have awarded the maximum amount of enhanced damages where the defendant was in the business of selling descrambling devices. *See, e.g., Time Warner Entertainment/Advance-Newhouse Pshp. v. Worldwide Elecs, L.C., 50 F. Supp. 2d 1288, 1301-02 (S.D. Fla. 1999)* (awarding $ 50,000 in enhanced damages, the maximum under § 553, based on defendants' business of selling descrambling devices with full knowledge of its illegality). n18

> n17 Some courts have awarded relatively minimal enhanced damages even where there are multiple violations. *See, e.g., Diaz, 39 F. Supp. 2d at 125* (awarding $ 100,000 for defendants' willful sale of 750 illegal devices, or $ 133 for each violation, despite the fact that the maximum damages was $ 100,000 for each willful violation); *Lokshin, 980 F. Supp. at 115* (awarding $ 1,500 in enhanced damages for a six-year violation where the services already received by defendant were near the statutory maximum). [*44]

> n18 In *Entertainment by J&J, Inc. v. Friends II, Inc*, which involved the unauthorized interception and broadcast of a boxing match telecast by a bar, the court listed the following factors to be considered in awarding enhanced damages for willfulness: (1) repeated violations over time, (2) substantial monetary gains, (3) significant actual damages, (4) advertising for the

stolen programming, and (5) charging a cover or a premium for drinks or food. *2003 U.S. Dist. LEXIS 7229, 2003 WL 1990414, at *4 (S.D.N.Y. 2003).* There, the court awarded $ 3,000 in enhanced damages for willfulness explaining that, although the defendants had charged a cover, there were only 35 patrons present and only two small televisions showing the match. *Id.*

But even where commercial establishments are involved, the amount of enhanced damages awarded varies considerably. *Compare Friends II* (awarding $ 3,000 for a single violation); *Recio, 2003 U.S. Dist. LEXIS 10440, 2003 WL 21383826, at *5* (awarding $ 2,000 for a single violation where defendant profited from selling food and drink); *Choquette, 53 F. Supp. 2d at 113* (awarding $ 3,000 where free cable service was offered to tenants and the defendant therefore theoretically was able to charge them higher rent for this inclusion); *and Entm't by J&J Inc. v. Nina's Rest. & Catering, 2002 U.S. Dist. LEXIS 8908, 2002 WL 1000286, at *3 (S.D.N.Y. 2002)* (awarding $ 2,500 for single violation), *with Jasper Grocery, 152 F. Supp. 2d at 442* (awarding $ 10,000 despite lack of evidence of repeated violations or substantial monetary gains by the defendant), *and Pete, 1999 WL 638215* at *2 (awarding $ 5,000 in for a single violation to deter future piracy of pay-per-view events even though defendant did not charge a cover and there were only 8 patrons present).

[*45]

Overall, the amount of enhanced damages that have been awarded by the courts appears to be somewhat arbitrary and, for the most part, not based on any specific articulated factors. Courts obviously tend to award low enhanced damages for single violations by individual subscribers, but the amount awarded appears to be largely arbitrary. To maintain some semblance of consistency with the case law in this circuit, the Court will adopt the position that a $ 1,000 enhanced damages penalty is the presumptively correct amount for single violations by individual subscribers. *See Salinetti, 148 F. Supp. 2d at 123* (adding $ 2,500 in enhanced damages where a club illegally exhibited a boxing match to patrons; concluding that such conduct was not particularly egregious); *Choquette, 53 F. Supp. 2d at 113* (awarding enhanced damages of $ 3,000 where, over the course of several years, a landlord distributed illegally intercepted cable service to his tenants as part of their rent); *Pier House Inn, 930 F. Supp. at 737* (enhancing damages by $ 5,000 where a hotel illegally intercepted cable service and blatantly advertised that it offered free

cable [*46] in order to obtain a competitive advantage over other lodging places).

## D. Injunctive Relief

Injunctive relief is available under $\S$ 553(c)(2)(A), which provides that the Court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section." Courts routinely enter injunctions preventing defendants from illegally intercepting cable. *See e.g., Naranjo, 303 F. Supp. 2d at 50. But see Cablevision of S. Conn. Ltd. Pshp. v. Smith, 141 F. Supp. 2d 277, 287-88* (refusing to issue injunction because plaintiff failed to establish irreparable harm and admitted to the court that it wanted an injunction so it could expose plaintiff to contempt sanctions). Accordingly, Charter will be granted statutory injunctive relief against each defendant here.

## E. Costs

*Section 553(c)(2)(C)* authorizes the court in its discretion to "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." In each of the cases before the Court, Charter has requested the costs of the filing fee and deputy sheriff's fee for service of the summons and complaint, [*47] as set forth in an attached affidavit. Accordingly, Charter will be awarded costs as follows: against Cintron, $ 198.94; against Sosa, $ 204.20; and against Burdulis, $ 204.20.

## F. Attorneys' Fees

### 1. Methodology for Determining Attorneys' Fees

As noted, *section 553(c)(2)(C)* also authorizes the court in its discretion to award reasonable attorneys' fees to a prevailing party. "Given the burden borne by cable operators to protect and redress their statutory rights through civil actions from what is also criminal conduct," it is appropriate to award attorneys' fees in these cases. *Diaz, 39 F. Supp. 2d at 126.*

The First Circuit follows "the 'lodestar' approach, which calculates reasonable attorneys' fees as 'the number of hours reasonably expended multiplied by a reasonable hourly rate.'" *Naranjo, 303 F. Supp. 2d at 50* (quoting *Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir. 1980))*. A reasonable hourly rate is measured according to the prevailing market rates in the relevant community and by considering factors such as "'the type of work performed, who performed it, the expertise that is required, and when it [*48] was undertaken.'" *Choquette, 53 F. Supp. 2d at 114* (quoting *Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 951 (1st Cir. 1984))*. To determine the number of hours reasonably spent, the Court must subtract from the number of hours actually

spent "'hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Id.* (quoting *Grendel's Den, 749 F.2d at 950*). This figure represents the lodestar; the Court may adjust the lodestar upward or downward to reflect other factors, including the result obtained. *Id. at 114-15* (citing *Grendel's Den, 749 F.2d at 951*). "The First Circuit considers three meanings of the term 'results obtained': plaintiffs success on each claim, relief actually achieved, and the societal importance of the right which has been vindicated." *Id. at 116.*

At least two factors particular to these cases may affect the amount of attorneys' fees to be awarded from the amounts requested by plaintiffs.

First, it appears from the cases currently before the Court that Charter has filed multiple, largely identical lawsuits, corresponding to information it received from a raid on a distributor. [*49] Although counsel have filed nearly identical complaints, affidavits, and motions for each defendant, counsel have not specifically acknowledged the duplicative nature of the work in their billing. One would expect that the first case to be investigated, researched, and filed would bear the lion's share of the legal expenses, and that each additional similar case would involve substantially less effort by the attorneys. Counsel instead seeks largely identical fees for each case. It is not possible to tell from the record whether the time commitment has in fact been identical, whether the attorneys have attempted to allocate their legal fees to spread the cost of the litigation across all cases equally, or whether the fees otherwise have been adjusted.

Second, Charter requested relief under *47 U.S.C. $ 605*, which, as explained above, does not apply to cable piracy. The Court may consider this fact in assessing the result obtained in these cases and whether there should be a corresponding downward departure from the lodestar.

Nonetheless, Congress has clearly stated that successful plaintiffs are to be awarded their attorneys' fees. The Court recognizes that, [*50] given the relatively low damage awards involved in cable-piracy cases, injured cable operators might not be inclined to vindicate their statutory rights if attorneys' fees were not available. Accordingly, the Court will grant Charter reasonable attorneys' fees in these cases, upon fulfillment of the conditions set forth below.

### 2. Amount of Attorneys' Fees

Counsel for Charter have not provided the Court sufficient information with which to calculate reasonable awards of attorneys' fees in these cases. In particular, the Court requires further information about the allocation of

2005 U.S. Dist. LEXIS 11678, *

legal expenses across largely identical lawsuits in multiple cases. Counsel should also identify what portion of the legal fees involved research or preparation of claims brought under *47 U.S.C. § 605* as opposed to *§ 553*. Accordingly, counsel are directed to submit within 21 days a further sworn statement regarding attorneys' fees in these cases, at which time the Court will enter appropriate awards of attorneys' fees.

**Conclusion**

Upon receipt and review of counsel's further statement regarding attorneys' fees, the Court will enter orders in the individual cases **[*51]** consistent with this memorandum, and judgment shall enter in favor of Charter.

F. Dennis Saylor IV

United States District Judge

Dated: January 11, 2005